Filed 7/30/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PAUL CURTIS et al., | B238870 |
| Plaintiffs and Appellants, | (Los Angeles County |
| v. | Super. Ct. Nos. MC021243, MC021242 and MC022270) |
| COUNTY OF LOS ANGELES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Randolph A. Rogers, Judge. Affirmed.

Greene, Broillet & Wheeler, Geoffrey S. Wells, Tobin M. Lanzetta; Esner, Chang & Boyer, Stuart B. Esner, and Andrew N. Chang for Plaintiffs and Appellants.

Collins Collins Muir + Stewart, Melinda W. Ebelhar, Christian E. Foy Nagy, and Erin R. Dunkerly for Defendant and Respondent.

_____

# INTRODUCTION

Appellants Paul Curtis and his wife, Desiree Munoz, sued respondent County of Los Angeles for injuries sustained in a vehicle collision precipitated by another motorist, Andres Salazar Meza, while driving on Sierra Highway. The trial court granted respondents' motion for summary judgment, and appellants appealed. In affirming, we conclude that respondent showed that with the exception of the lack of a center median space or barrier, appellants could not raise a triable issue of fact that their injuries were "proximately caused by the dangerous condition[s]" alleged in their complaint. The evidence established that the accident was caused by Meza's intentional act of crossing the double yellow line into oncoming traffic. With respect to any harm arising from the lack of a center median, respondent established its entitlement to design immunity, by showing that an authorized official exercised his discretional authority to approve plans for the highway that included neither a median space nor a barrier.

## STATEMENT OF THE FACTS

On May 18, 2009, Andres Salazar Meza was driving eastbound on Sierra Highway, in the lane closest to the double yellow line. Curtis was driving behind Meza, with Munoz as his sole passenger. At approximately 5:10 p.m., Meza crossed over into the westbound lanes, hitting a vehicle driven by Shaun Glendenning. The collision caused Glendenning's vehicle to spin and cross over into the eastbound lanes, hitting appellants' vehicle head on.

## STATEMENT OF THE CASE

On April 22, 2010, appellants filed a first amended complaint for damages, alleging causes of action for dangerous condition of public property (Gov. Code,

2

§ 835)[1] and vicarious liability (§§ 815.4 & 815.2, subd. (a)) against respondent, and a cause of action for negligence against Meza. Appellants alleged they suffered severe and permanent injuries as a result of a multi-vehicle traffic accident initiated by Meza.[2] They further alleged that the accident resulted from dangerous conditions of the road, which were created by the negligent, careless, and reckless acts or failures to act of respondent. These negligent or reckless acts or failures to act included: (1) failure to install any barrier at the accident location, (2) failure in the design of the width of the road, (3) failure in the design of the superelevation or banking of the road, (4) failure to include an adequate and appropriate median area, (5) failure in the design of the width of the shoulders, (6) failure to properly warn of dangerous conditions, (7) failure in the striping of the road, (8) failure to properly and adequately align the road, and (9) failure to design and maintain the road. Appellants also alleged that the average operational speed on Sierra Highway was 60 to 65 miles per hour (mph), and that the curve radius and superelevation of Sierra Highway did not meet current highway design standards for that operational speed.

Respondent filed an answer, generally denying the allegations. Respondent asserted numerous affirmative defenses, including (1) that it was immune for the design of the road pursuant to section 830.6, and (2) that "[t]he sole cause of the accident . . . was the negligence of . . . M[eza] who negligently and carelessly crossed over into an opposing lane of traffic."

---

[1]    All further statutory citations are to the Government Code, unless otherwise stated.

[2]    Meza acknowledged liability for the accident and is not a party to this appeal.

On March 31, 2011, respondent filed a motion for summary judgment. It asserted that the accident was not caused by a dangerous condition of public property, as the road at the accident location was "safe to foreseeable users when used with due care," and Meza had acknowledged that his own negligence caused the multi-vehicle accident. Respondent argued in the alternative that even if the accident resulted from a dangerous condition of the road, it was immune from liability pursuant to section 830.6, the design immunity statute, as the allegedly dangerous conditions of the road were considered and approved by the Los Angeles County Department of Public Works (DPW). Finally, respondent contended that the cause of action for vicarious liability was not viable, as the sole basis for imposing liability on a public entity for harms arising from alleged property defects is section 835.

In a declaration filed in support of the motion for summary judgment, William Winter stated that he was a licensed civil engineer who, since April 2003, had served as an assistant deputy director and later the deputy director of the DPW. As an assistant deputy director, he had the delegated authority to review and approve plans for county highways. Winter stated that in 2003, he approved "Specification and Plans" for Sierra Highway (the 2003 plans). He stated that in preparing the 2003 plans, "DPW reviewed and considered, among other factors, . . . the absence of a center median space and center median barrier. . . ." Winter stated that in his professional engineering judgment, "a center median . . . [was] not feasible due to a variety of technical reasons . . . . In addition[,] there were property ownership reasons and environmental considerations that would preclude any immediate change to the alignment or cross section of Sierra Highway." He further stated that "in order to even consider installing a center median barrier[,] there would need to be a center median of at

4

least ten feet (10') in width.  Technical, property ownership and environmental considerations preclude[d] any immediate installation of a center median that is 10' in width."

A copy of the 2003 plans was attached to Winter's declaration.  The plans included design drawings showing a detailed section of Sierra Highway.  The drawings showed no median space or median barrier.

In 2007, Winter approved a "Signage Plan" for Sierra Highway, which added yellow flashing beacons along the highway (the 2007 plans).  Winter stated that in preparing the 2007 plans, "DPW reviewed and considered the then-existing conditions of the Sierra Highway including . . . the absence of a center median . . . ."  The design drawings for the 2007 plans show where yellow flashing signals would be added.  They showed no median space or median barrier.

Appellants opposed the motion for summary judgment, asserting that respondent had failed to meet its burden of showing it was entitled to design immunity.  Appellants argued that "[n]either of the [2003 or 2007] interim plans demonstrates that geometric features which plaintiffs allege caused the accident -- the curve radii and superelevation of the subject highway curves -- were even considered, much less designed and approved by an individual with discretionary authority to approve such geometric design features."  Assuming there was design immunity, appellants contended it was lost when respondent allegedly "acknowledged" that the highway had become dangerous but did not remedy the danger in a reasonable time.

In support of the opposition, appellants submitted a declaration by Harry J. Krueper, Jr., a licensed civil engineer and traffic engineer.  Krueper stated that after his firm was retained by appellants in 2010, the firm's staff conducted a field survey of the accident site and "ball bank" tests.  The field survey showed that the

5

highway lanes and shoulder widths were narrower than recommended by the American Association of State Highway and Transportation Officials (AASHTO) and the State of California. The ball bank tests indicated that the curve of the road was safe for vehicles traveling at 55 mph. A spot speed test of the road indicated that the "85th percentile speed" was 61 mph for westbound traffic, and 61.3 mph for eastbound traffic. Based on the field survey and the ball bank and speed tests, Krueper opined that Sierra Highway was dangerous under normal highway use.

Krueper also opined that there had been a "high accident rate" for the 0.47 mile area of Sierra Highway that included the accident site. His opinion was based upon a review of California Highway Patrol records showing there had been 64 accidents in the decade from 1999 to 2009.

Appellants also submitted a declaration by Matthew Manjarrez. Manjarrez, a registered civil engineer and traffic engineer, stated that Sierra Highway is characterized by high traffic volume and high traffic speed. He stated, "[a] large number of various count data from 2003 through 2010 . . . [showed] the average daily traffic on Sierra Highway at the subject location was approximately 41,000 vehicles per day. This is consistent with the Engineering and Traffic Survey conducted in November 2001, which identified an average daily traffic volume at the subject location of 41,338." Manjarrez also stated that in January 2006, speed survey data showed that the 85th percentile speed of drivers on northbound Sierra Highway traffic near the subject location was 63 mph. Speed survey data collected in March 2006 showed the 85th percentile speed was 61 mph. Similar speeds were recorded in April 2001, which found an 85th percentile speed of 62 mph.

Manjarrez also stated that a review of the traffic collision history report showed there had been four cross-centerline collisions in the five-year period from 2002 through 2007. This translated to an accident rate of 0.94 per mile per year.

6

This accident rate was high, as section 7-04 of the Caltrans traffic manual identifies a cross-centerline collision rate higher than 0.50 per mile per year as a high rate. Manjarrez opined that "given the existing operational characteristics of Sierra Highway coupled with its geometric characteristics, there was a substantial risk of injury for drivers travelling through the subject location while using reasonable care, in the manner in which the roadway was intended to be used."

Respondent filed a reply, contending that it was Meza's lack of due care that caused the accident. Respondent asserted that "[p]laintiffs have made no effort to offer this Court any evidence demonstrating how any alleged defect **caused** the accident. The proximate cause of the accident is clear: co-defendant Andres Salazar Meza has acknowledged liability." Respondent contended that at his deposition, Meza testified that "while heading north on Sierra Highway . . . , he maneuvered from the number two lane to the number one lane. . . . Meza was traveling [at] 45-50 miles per hour, which is at or below the 50 mile per hour posted speed limit. . . . While in the number one lane, alongside [a] trailer, Meza saw the trailer swerve into his lane and so Meza purposefully crossed the double yellow line. . . . Meza saw the oncoming traffic, saw the double yellow line, and intentionally crossed it. . . . Meza did not testify that he lost control of his car in any way. Neither he, nor his wife who was his passenger, nor anyone else in this case has testified that any aspect of the road (let alone the signage, striping, shoulders, median, superelevation, or curve radius) caused the accident."

Respondent also argued that it was entitled to design immunity. It contended that appellants had not shown loss of design immunity, as they had produced no evidence showing a change in the physical conditions of the road after the 2003 plans were implemented.

7

On July 26, 2011, the superior court partially granted and partially denied the motion for summary judgment. The court granted summary judgment as to the cause of action for vicarious liability, determining it was not viable.[3] As to the cause of action for dangerous condition of public property, the court held that respondent was not entitled to design immunity. The court determined that no evidence showed Winter had considered superelevation and curvature radii in the design of the highway. Finally, the court ordered the parties to provide further briefing, including expert evidence, on the issue "whether a reasonable trier of fact could find it was probable that [appellants'] injuries were proximately caused by the [dangerous] conditions [they] identified." The court subsequently continued the hearing on the motion for summary judgment to September 13, 2011.

On August 17, 2011, appellants filed their brief on causation. They argued that they had provided "expert declarations which raise[d] triable issues of material fact concerning how each of the numerous alleged dangerous conditions -- small and inconsistent curve radius, lack of superelevation, high speeds, inconsistent lane width, minimal paved shoulders, no separation between vehicles traveling in opposite directions, and high traffic volume -- were a substantial factor in causing the accident." Appellants contended that Meza's negligence did not foreclose the possibility that the alleged dangerous conditions of the road contributed to the accident. Appellants argued there was a triable issue of material fact as to whether "Meza crossed the centerline because he was unable to safely negotiate the curve due at least in part to the dangerous features of the subject roadway."

In a supplemental declaration in support of appellants' brief on causation, Manjarrez opined that "the existing operational characteristics of Sierra Highway coupled with its geometric characteristics were a contributing cause of the subject

---

[3]     Appellants do not challenge this ruling on appeal.

8

collision." He asserted that the superelevation and curve radius "increased the risk of a driver losing control." He also stated that the subject area had minimal paved shoulders. Thus, "drivers who begin to leave the roadway to the right have a propensity to over-correct and lose control traveling towards oncoming traffic." He also asserted that "the lack of a median separation increased the risk that a driver would inadvertently enter oncoming traffic lanes." Finally, he asserted that "the high traffic volume at the subject location results in a significant risk that vehicles crossing the centerline will collide with one or more vehicles traveling in the opposite direction."

Krueper also filed a supplemental declaration in support of appellants' brief on causation. Krueper reiterated his prior opinion that the features of the road were dangerous under anticipated and normal highway use. In addition, he stated that "Meza claims that as he drove in the number one lane . . . , a vehicle in the number 2 [lane] moved over slightly into the number one lane of travel. Mr. Meza claims that this caused him to swerve into oncoming [traffic]." Krueper opined that "if Mr. Meza's claims are to be believed, it is my opinion to a reasonable degree of probability in my field of expertise that the features or lack thereof of the roadway, as detailed above including but not limited to the lack of center median space or barrier, inadequate shoulder width, inadequate lane width and inadequate super elevation and curve radii[,] were a cause that contributed to the collision that injured Plaintiffs because there existed a lack of recovery area."

Krueper also stated: "Additionally, based upon the deposition of Officer Russell Moore and his traffic collision report, only Mr. Meza reported seeing a vehicle in the number two lane. . . . Therefore, if Mr. Meza is mistaken and there was no vehicle intruding into his lane of travel, and he failed to negotiate the subject roadway, it is still my opinion . . . that the features or lack thereof of the

9

roadway, as detailed above including but not limited to the lack of center median space or barrier, inadequate shoulder width, inadequate lane width and inadequate super elevation and curve radii[,] were a cause that contributed to the collision that injured Plaintiffs, as detailed above."

Respondent's brief addressing causation argued that the sole cause of the collision was "a purposeful and knowing driving maneuver by . . . Meza." Respondent asserted that: "Plaintiffs' counsel questioned Meza at length during [his] deposition, but *never asked* Meza whether his driving was affected in any way by the allegedly defective road conditions identified in Plaintiffs' complaint. In contrast, County's attorney *did ask* Meza whether there was anything wrong with the roadway, and Meza said no."

Respondent also addressed each of the issues raised by appellants' experts in their supplemental declarations. As to superelevation, curve radii and high speeds, respondent noted that Meza was traveling at 45 to 50 mph, which was within the "validated safe 'ball bank' speed." As to lane width, respondent argued that Krueper never defined "'drivability'" or "'loss of "recovery area.""" Respondent contended that "[d]isregarding lack of clarity, the larger problem is that Mr. Krueper does not explain how much lane width was needed to prevent this accident from happening, or how any particular lane width would have had any effect on Meza's decision to drive his truck toward oncoming traffic in an effort to avoid a vehicle Meza thought was encroaching on his lane." As to the shoulder width, respondent noted that the accident occurred when Meza swerved toward his left. Thus, the inadequacy of the shoulders on the right side of the highway was not legally relevant to the accident. As to median separation, respondent argued that appellants' experts did not provide a foundation to support their argument on causation. Finally, as to high traffic volumes, respondents argued that neither

10

expert addressed the causal relationship between high traffic volumes and the instant accident.

On September 9, 2011, appellants filed a reply brief, contending that their experts' opinions were fully admissible and raised triable issues of material fact on causation. Appellants contended that Meza's deposition testimony about his actions during the accident was disputed. They asserted that "not one of the other motorists or passengers on the roadway saw a truck towing a motor home. Rather, these witnesses all agree that Mr. Meza did not drive over the center line in response to such a truck. Thus, the investigating officer's report and the deposition testimony of the two plaintiffs and another eyewitness (attached [to the reply brief]), establish that no one saw the 'phantom vehicle' that Meza claims he tried to avoid by driving across the center line."

Appellants attached excerpts from the depositions of Curtis and Munoz, and an excerpt of the uncertified rough draft of the deposition of Kimberly K. Dobson, who was the sole passenger in Glendenning's vehicle. In his deposition, Curtis was asked, "Did you see a truck at all begin to enter into the number 1 lane from the number 2 lane at all, prior to the impact?" He answered, "Not that I remember." In Munoz's deposition, counsel asked her, "Do you remember any vehicles that were in the number two lane proceeding in the same lane of travel before the impact?" She replied, "I don't know." Finally, in Dobson's deposition, counsel asked, "'Did you notice any other vehicles next to or near the driver who ultimately struck you? Meaning did you notice a vehicle in the number two lane of the [eastbound] traffic?" She answered, "No." Counsel also asked, "Before the collision, did you notice any vehicle in northbound traffic, meaning opposing you, that was pulling a trailer just before the collision?" She answered, "No."

11

On September 12, 2011, respondent moved to strike appellants' reply brief on causation, arguing that appellants had failed and refused to serve the reply brief in a timely and nonprejudicial manner.

On September 13, 2011, after the hearing on the motion, the court granted respondent's motion for summary judgment. In its written statement of decision, the court did not list appellants' reply brief on causation among the documents it considered in reaching its decision. The court concluded that respondent was entitled to summary judgment because: (1) appellants failed to establish triable issues of material fact as to whether the superelevation, curve radii and shoulder and lane widths of the subject road constituted dangerous conditions of public property; (2) appellants failed to establish a triable issue of fact as to causation; and (3) respondent was entitled to design immunity as to whether the lack of a median or barriers caused or contributed to the subject accident.

After judgment in favor of respondent was entered, appellants timely appealed.

## DISCUSSION

Appellant contends the trial court erred in granting summary judgment. For the reasons explained below, we disagree.

A.     Standard of Review

"A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. [Citation.]" (*Molko v. Holy Spirit Assn*. (1988) 46 Cal.3d 1092, 1107.)  Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie

12

showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) In moving for summary judgment, "all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action—for example, that the plaintiff cannot prove element *X*." (*Id.* at p. 853.)

"'Review of a summary judgment motion by an appellate court involves application of the same three-step process required of the trial court. [Citation.]'" (*Bostrom v. County of San Bernardino* (1995) 35 Cal.App.4th 1654, 1662.) The three steps are (1) identifying the issues framed by the complaint, (2) determining whether the moving party has made an adequate showing that negates the opponent's claim, and (3) determining whether the opposing party has raised a triable issue of fact. (*Ibid.*)

"Although we independently review the grant of summary judgment [citation], our inquiry is subject to two constraints. First, we assess the propriety of summary judgment in light of the contentions raised in [appellant's] opening brief. [Citation.] Second, to determine whether there is a triable issue, we review the evidence submitted in connection with summary judgment, with the exception of evidence to which objections have been appropriately sustained. [Citations.]" (*Food Safety Net Services v. Eco Safe Systems USA, Inc.* (2012) 209 Cal.App.4th 1118, 1124.)

B.     Analysis

Appellants asserted a cause of action for dangerous condition of public property under section 835. Section 835 provides that "a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, [and] that the

13

dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred . . . ."

As explained below, with respect to the conditions other than the absence of a center median space or barrier allegedly responsible for the accident, appellants failed to raise a triable issue of fact as to causation. Respondent's evidence established that the accident was caused by Meza's purposeful decision to cross the double yellow line into oncoming traffic. With respect to harm allegedly resulting from the absence of a center median space or barrier, respondent established its entitlement to design immunity under section 830.6, by producing uncontroverted evidence that DPW Deputy Director Winter exercised his discretionary authority to approve plans in 2003 and 2007 that included neither a median space nor barrier.[4]

1.     Causation

Appellants contend the trial court erred in granting summary judgment on the ground of lack of proximate causation because the dangerous road conditions were substantial factors in causing the accident. We disagree.
In his deposition, Meza testified he intentionally swerved to his left and into oncoming traffic to avoid a trailer that encroached into his lane. His statement to the highway patrol officer at the accident site was consistent with his deposition testimony. Meza never identified any condition of the road that caused him to lose control of his vehicle. No witness contradicted Meza's explanation for his actions. Nor was any witness competent to testify as to Meza's state of mind at the time of the accident. On this point, *Chowdhury v. City of Los Angeles* (1995) 38

---

[4]     In granting summary judgment, the trial court further found that appellants had failed to show the property was in a dangerous condition at the time of the accident. On appeal, respondent does not assert this ground as a basis for affirming the grant of summary judgment. As we find summary judgment was properly granted on the two grounds stated above, we need not address the issue.

14

Cal.App.4th 1187 is instructive. There, an area-wide electrical power failure rendered all the traffic lights inoperative. A motorist, Lim, failed to stop before proceeding through an intersection, resulting in a fatal accident. (*Id*. at p. 1190.) Lim testified he did not stop at the intersection because he had a green light. (*Id*. at p. 1193.) Plaintiff's expert opined, however, that Lim may have "'felt he had the right of way'" because the intersection lacked temporary pedestal stop signs that had been posted at prior intersections. Finding no evidence that the stop signs were a substantial factor in causing the accident, the Court of Appeal observed: "Lim did not testify that his failure to stop at the intersection . . . was caused by some confusion created by the pedestal stop signs he had previously encountered. Lim unequivocally testified that he did not stop because he had a green light. From this, a fact finder could infer that Lim (1) suffered a visual misperception, or (2) was lying to justify his failure to stop at the nonfunctioning light. It cannot be inferred from the testimony that Lim was confused by the pedestal stop signs. The testimony of [plaintiff's] expert that Lim 'felt he had the right of way' due to the pedestal stop signs is pure conjecture and surmise, attributing thoughts to Lim that Lim denied having . . . ." (*Id*. at p. 1197.) The same is true here. Meza acknowledged that he crossed the yellow line into oncoming traffic intentionally, not inadvertently, and not because any condition of the roadway caused him to lose control of his vehicle. Thus, appellant's experts' suggestion that Meza may have "inadvertently enter[ed] oncoming traffic lanes" or otherwise "failed to negotiate the subject roadway" is both speculative and refuted by Meza's own testimony.

Appellants contend they produced evidence in their reply brief on causation showing that no one saw a "phantom vehicle" encroach into Meza's lane. The trial court impliedly excluded this evidence, as the court did not consider the reply brief in its decision. Appellants do not challenge the exclusion of this evidence on

appeal, and thus have forfeited the argument. Even if considered, however, the evidence does not contradict Meza's testimony. The fact that neither Curtis nor Munoz could remember seeing a vehicle encroach into Meza's lane does not contradict his testimony of what he saw. Dobson's testimony is from an uncertified rough partial transcript. Assuming its admissibility, her testimony does not create a triable issue of material fact, as it does not contradict Meza's testimony; there is simply no basis to infer that Dobson, a passenger in a vehicle on a multi-lane highway, would notice a vehicle two lanes away on the other side of the highway. More important, even if the truck was a figment of Meza's imagination, it is uncontroverted that he purposefully and knowingly crossed over the double yellow line into oncoming traffic. In short, it was Meza's volitional conduct -- not any condition of the road -- that caused the accident.

Appellants next contend their experts' opinions raised triable issues of material fact as to causation. We disagree. The superelevation and curve radii were purportedly dangerous for vehicles going at speeds in excess of 55 mph. However, Meza's uncontroverted testimony was that he was driving at 45 to 50 mph. Similarly, no evidence showed the other vehicles involved in the accident exceeded the "safe speed." Thus, appellants have failed to show a causal relationship between the subject accident and the superelevation and curve radii of the road.

Likewise, appellants have not shown a causal relationship between the high traffic volume and high traffic speeds and the subject accident. As noted, the vehicles involved were not traveling at dangerously high speeds. Nor was there any evidence that the accident was caused or exacerbated by a high volume of traffic. Nothing suggested that the drivers involved were impeded from taking evasive action by the volume of traffic surrounding their cars.

16

Finally, appellants have not shown a causal connection between the purportedly inadequate and inconsistent lane and shoulder widths and the subject accident. No evidence showed that the accident could have been prevented if the lanes and shoulders were wider. For example, a wider shoulder would not have assisted Meza, as he swerved to the left and the shoulders are on the right side of the road. Similarly, there was no evidence that Glendenning had time to evade Meza's vehicle by swerving toward his right across two lanes of traffic. In short, appellants have not shown a triable issue of material fact that the physical conditions of the road (aside from the lack of a median space or barrier) were substantial factors in causing the accident.

2. Design Immunity

The trial court impliedly found that a median separation or a median barrier could have prevented the subject accident. A median space might have allowed Meza to avoid the encroaching truck without entering into the driving lane of oncoming traffic; a median barrier would have physically prevented Meza from crossing the divider into oncoming traffic. The court found, however, that respondent was immune from liability under section 830.6.

Section 830.6 provides that a public entity is not liable for "an injury caused by the plan or design of a construction of, or an improvement to, public property where such plan or design has been approved in advance of the construction or improvement . . . by some other body or employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved, if the trial or appellate court determines that there is any substantial evidence upon the basis of which . . . a reasonable public employee could have adopted the plan or design or the standards therefor . . . ." Thus, in order to demonstrate entitlement to design immunity, a

17

public entity must establish "three elements: (1) a causal relationship between the plan or design and the accident; (2) discretionary approval of the plan or design prior to construction; and (3) substantial evidence supporting the reasonableness of the plan or design. [Citations.]" (*Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 69 (*Cornette*).)

Here, appellants do not dispute there was a causal relationship between the lack of a median space or barrier and the accident. Indeed, the complaint and appellants' expert opinions alleged the lack of a median space or barrier caused or substantially contributed to the accident.

As to the second element, respondent presented evidence that DPW Deputy Director Winter considered and exercised his discretionary authority to approve plans that did not include a median space or barrier. The design drawings for the 2003 and 2007 plans show neither a median space nor a barrier. Winter stated that in his professional engineering judgment, "a center median . . . [was] not feasible due to a variety of technical reasons . . . ." He further stated that "in order to even consider installing a center median barrier[,] there would need to be a center median of at least ten feet (10') in width. Technical, property ownership and environmental considerations preclude[d] any immediate installation of a center median that is 10' in width." The drawings and declaration are sufficient to show that Winter considered a median space and/or barrier, but rejected those features in the exercise of his discretionary authority. (See *Sutton v. Golden Gate Bridge, Highway. & Transportation Dist.* (1998) 68 Cal.App.4th 1149, 1159 [District's board of directors made decision to omit median barrier after authorizing a design that did not include a median barrier, following review of a study on feasibility and desirability of installing median barrier]; see also *Wyckoff v. State of California* (2001) 90 Cal.App.4th 45, 55 [state entitled to design immunity because design

18

drawings showed a median space only; absence of median barrier thus was part of design].)

Appellants' reliance on *Cameron v. State of California* (1972) 7 Cal.3d 318, 325-326 (*Cameron*), and *Hernandez v. Department of Transportation* (2003) 114 Cal.App.4th 376, 387-388 (*Hernandez*), is misplaced. In *Cameron*, the Supreme Court rejected design immunity as to superelevation of the subject road because "[t]he state merely showed that the Santa Cruz Board of Supervisors approved a design showing the course of the right of way and the elevation above sea level of the white center stripe for the road. The design plan contained no mention of the superelevation intended or recommended." (*Cameron*, at p. 326.) In contrast, here, the absence of a median space or barrier was part of the design. In addition, because the subject road in *Cameron* would necessarily have had some degree of superelevation, the failure to specify the degree suggested that it was not considered. Here, in contrast, the absence of a median space or barrier does not suggest a similar lack of consideration.

In *Hernandez*, the appellate court rejected a finding that design plans were approved by authorized Caltrans officials because of conflicting evidence. (*Hernandez*, *supra*, 114 Cal.App.4th at p. 388.) The conflicting evidence included: (1) expert testimony that any deviation from Caltrans guidelines required formal documentary approval that was not produced in the case; and (2) an admission by Caltrans's own expert that "he did not know whether any of the three engineers who signed the as-built plans actually considered the guardrail installation guidelines and approved the purported deviation from the guidelines' requirements." (*Id*. at p. 381.) No such conflicting evidence was presented here. Although appellants argued that the lack of a median space or barrier created a dangerous condition of the road, they did not allege that the lack of a median space

or barrier was a "deviation" from any guideline.[5] Moreover, DPW Deputy Director Winter stated he considered and approved plans that clearly did not include a median space or barrier. Additionally, he set forth reasons why such a feature was not then feasible.

As to the final element, in their opening brief, appellants do not address the reasonableness of a lack of a median space or barrier. Thus, they have forfeited any argument on this point. Even were we to consider the contention, we would reject it. "[A] detailed plan, drawn up by a competent engineering firm, and approved by [an official] in the exercise of [his] discretionary authority, is certainly persuasive evidence of both elements of prior approval and reasonableness for purposes of the design immunity defense." (*Anderson v. City of Thousand Oaks* (1976) 65 Cal.App.3d 82, 89-90, fn. omitted.) In addition, it is not unreasonable not to install a median barrier. As courts have recognized, "[m]edian barriers result in a trade-off. They prevent nearly all cross-median accidents, but usually result in an overall increase in accidents and injuries. A median barrier is a fixed object which, when hit, can cause serious injury either by direct impact or by deflecting vehicles back into traffic. In addition, a barrier eliminates half the recovery area for out-of-control vehicles." (*Alvarez v. State of California* (1999) 79 Cal.App.4th 720, 724, overruled on other ground in *Cornette*, *supra*, 26 Cal.4th at p. 74, fn. 3.) In short, respondent has shown that it was entitled to design immunity.

---

[5] In their reply brief, appellants assert they presented evidence that "the County's lack of a median or barriers did not comply with section 7-04 of the Traffic Manual." The record citation does not support this assertion, as appellants' evidence showed only that section 7-04 provides guidelines concerning what constitutes a "high" accident rate.

20

Appellants contend that respondent lost its design immunity.  "To demonstrate loss of design immunity a plaintiff must establish three elements: (1) the plan or design has become dangerous because of a change in physical conditions; (2) the public entity had actual or constructive notice of the dangerous condition thus created; and (3) the public entity had a reasonable time to obtain the funds and carry out the necessary remedial work to bring the property back into conformity with a reasonable design or plan, or the public entity, unable to remedy the condition due to practical impossibility or lack of funds, had not reasonably attempted to provide adequate warnings."  (*Cornette*, *supra*, 6 Cal.4th at p. 66.) Appellants contend they have produced evidence showing a triable issue of material fact as to each of these elements.  We disagree.

"[E]vidence of changed conditions must be evidence that physical conditions at a specific location have changed in such a manner that the original design has created a dangerous condition of which the entity has notice."  (*Dole Citrus v. State of California* (1997) 60 Cal.App.4th 486, 494.)  Appellants contend they have shown increased traffic flow, speed, and accident rate over the prior decade. However, their evidence does not show a changed condition after the 2003 or 2007 plans were approved.  For example, Manjarrez stated that "[a] large number of various traffic count data from 2003 through 2010 . . . [showed] the average daily traffic on Sierra Highway at the subject location was approximately 41,000 vehicles per day.  This is consistent with the Engineering and Traffic Survey conducted in November 2001, which identified an average daily traffic volume at the subject location of 41,338."  Based on this testimony, there was no demonstrated change in traffic flow.

Similarly, Manjarrez stated that in April 2001, speed data surveys showed the 85th percentile speed for vehicles on the highway was 62 mph.  In January

21

2006, the 85th percentile speed was 63 mph , and in March 2006, it was 61 mph. Krueper testified that in 2010, his firm conducted a speed survey showing the 85th percentile speed was 61 mph. This testimony indicated there had been no material change in traffic speed between 2001 and 2010.

Finally, as to the accident rate, Manjarrez stated there had been four cross-centerline collisions between 2002 and 2007. Krueper stated there had been 64 accidents over the decade from 1999 through 2009. However, no analysis of any *change* in accident rate over those time periods was produced. Thus, the evidence cannot create a triable issue of material fact as to the first of the three elements required to show that respondent lost its design immunity. Accordingly, appellants have failed to show a triable issue of fact as to loss of design immunity.[6]

In short, we discern no error in the trial court's decision granting summary judgment on the grounds (1) that the alleged dangerous conditions of Sierra Highway (except for the lack of a median space or barrier) were not the legal cause of the accident that resulted in appellants' injuries, and (2) that respondent was

[6] As to the other two elements required to show loss of design immunity, appellants have failed to raise triable issues of fact as to either. With respect to respondent's knowledge of a dangerous condition because of a change in physical condition, in the absence of evidence of change, there can be no knowledge. The subsequent 2008 plans to widen the highway do not demonstrate the highway was dangerous prior to 2008. "It is just as likely that the previous designs were quite adequate for their intended purpose and that the new [plans] only represent an attempt to improve the design. After all, an old mousetrap may still work effectively even after someone invents a better one." (*Dole Citrus v. State of California*, *supra*, 60 Cal.App.4th at p. 493.) With respect to the reasonableness of the time required to widen the highway, DPW Deputy Director Winter testified that technical, property ownership and environmental considerations precluded changes in 2003. The 2008 plans had a projected completion date of 2011. The accident occurred in May 2009, and nothing suggests the 2007 signage plans were not a reasonable attempt to provide adequate warnings pending completion of the 2008 plans.

immune from liability for not including a median space or barrier in the design of Sierra Highway.

## DISPOSITION

The judgment is affirmed.  Costs are awarded to respondent.

**CERTIFIED FOR PUBLICATION.**

MANELLA, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.